## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANT

I, Ryan S. Burke, depose and state as follows:

## AGENT BACKGROUND

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since October 2012. I am currently assigned to the FBI's New Hampshire Major Offender Task Force ("NHMOTF") where I am tasked with investigating violent criminals, gang members, and significant drug traffickers throughout the state. As part of the NHMOTF, I work alongside law enforcement officers from various local, state, and federal agencies throughout the state of New Hampshire. I am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

2. Throughout my career, I have led and/or been involved with investigations of drug distribution, violent crimes, and other offenses. My investigations have included the use of the following investigative techniques: physical surveillance; handling of cooperating sources and witnesses; exploitation of cellular, social media, and Internet Protocol ("IP") based communications data; execution of search and seizure warrants; wire, electronic, and oral wiretaps; and the execution of arrest warrants. Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the commission of various criminal offenses, such as those related to acts of violence, firearms, and controlled substances.

## PURPOSE OF AFFIDAVIT

3. I submit this affidavit in support of an application for a search warrant permitting the installation of a GPS tracking device on the following vehicle (hereafter, "Target Vehicle"):

  a. A beige 1999 Honda Accord currently bearing New Hampshire license plate 3021819 and according to New Hampshire Department of Motor Vehicle records bearing vehicle identification number JHMCG5644XC021652.

4. Based on the information contained herein, there is probable cause to believe the Target Vehicle is being used to facilitate violations of 21 U.S.C. §§ 841 & 846 (Distribution of Controlled Substances, Conspiracy to Distribute Controlled Substances) by Craig Pearson, Keeley Estes, and others yet unknown.

5. The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause of the issuance of the requested warrant.

## **PROBABLE CAUSE**

6. On March 10, 2022 at approximately 9:28 p.m., at the direction of law enforcement, Cooperating Witness 2 (hereafter, "CW-2")[1] contacted Pearson at phone number 603-550-9061 to arrange the purchase of a quarter-ounce of methamphetamine. Pearson agreed to sell the methamphetamine and directed CW-2 to the Courtyard by Marriott hotel in Manchester, New

---

[1] CW-2 has been cooperating with law enforcement since approximately March 2022. Prior to agreeing to cooperate with law enforcement, CW-2 was the target of controlled purchases of methamphetamine conducted by another cooperating witness. Since becoming a cooperating witness, CW-2 has utilized controlled substances while conducting a controlled purchase of methamphetamine on one occasion. When confronted by law enforcement, CW-2 immediately admitted to the violation. Additionally, since becoming a cooperating witness, CW-2 has also admitted to purchasing and selling methamphetamine on one occasion. Nevertheless, CW-2 has provided information related to criminal activity which has been corroborated by law enforcement and other witnesses – specifically the identification of individuals distributing controlled substances. Although CW-2 has committed criminal violations since becoming a cooperating witness, law enforcement still believes the surreptitious recordings conducted by CW-2 accurately capture evidence of criminal activity by others. CW-2 has convictions for the following offenses: Petit Larceny [M] (NY PL 155.25); Criminal Possession Controlled Substance [M] (NY PL 220.03); and Possession of Controlled Drug [F] (NH RSA 318-B:2,I).

Hampshire. CW-2 was then searched by law enforcement and confirmed not to be in possession of controlled substances. CW-2 was subsequently provided a concealed audio recorder and followed by law enforcement to Pearson's hotel.

7. When CW-2 arrived at the hotel, Pearson was waiting outside and escorted CW-2 to his room. While inside the room, CW-2 observed two females and a male in addition to Pearson. CW-2 paid Pearson for a previous debt of $800 and then purchased approximately 7 grams of a substance believed to be methamphetamine for $200. CW-2 also observed approximately one pound of what CW-2 believed to be methamphetamine inside a trash bag near the dresser of Pearson's hotel room. During the post-operation debrief, CW-2 also admitted to smoking methamphetamine while inside the hotel room.

8. On March 17, 2022 at approximately 5:28 p.m., at the direction of law enforcement, CW-2 contacted Pearson at 603-550-9061 to arrange the purchase of an ounce of methamphetamine. Pearson agreed to sell the methamphetamine and directed CW-2 to the parking lot of Luigi's Pizza in Manchester, New Hampshire to facilitate the deal. CW-2 was then searched by law enforcement and confirmed not to be in possession of controlled substances. CW-2 was subsequently provided a concealed audio recorder and followed by law enforcement to the parking lot.

9. Upon arrival to the parking lot, CW-2 called to notify Pearson who informed CW-2 that he would be arriving shortly as well. Soon after, two vehicles arrived in the otherwise empty parking lot: a black Honda Accord and the Target Vehicle. Law enforcement observed Estes as the driver of the Target Vehicle and Pearson as the only other passenger. Estes exited the Target Vehicle and met with CW-2 while Pearson exited the Target Vehicle and met with occupants of the black Honda Accord.

10. During the meeting between CW-2 and Estes, Estes provided CW-2 with approximately one ounce of a substance believed to be methamphetamine in exchange for $600. Estes also informed CW-2 that Pearson was "hitting off the black car" – a term I know is commonly used as a reference to distributing controlled substances. CW-2 then departed the lot while followed by surveillance and turned over the ounce of suspected methamphetamine to law enforcement.

11. Law enforcement also followed the black Honda Accord away from the Luigi's Pizza parking lot. Law enforcement eventually conducted a motor vehicle stop of it. The vehicle was seized pending application for a search warrant. The search of the vehicle resulted in the seizure of approximately 120 grams of a substance consistent with the characteristics of fentanyl.

12. On March 21, 2022, at the direction of law enforcement, Cooperating Witness 3 (hereafter, "CW-3")[2] contacted Destinee Fitz at phone number 603-785-8458 to arrange the purchase of two ounces of methamphetamine. CW-3 had previously informed law enforcement that Fitz acknowledged an individual named "Craig," whom I believe to be Pearson, was Fitz's methamphetamine supplier. During the recorded call, CW-3 asked Fitz to call "Craig" and inform him that CW-3 needed two ounces. Fitz concurred.

13. On March 24, 2022, Fitz informed CW-3 via iMessage that, "I just talked to him. He's in Manch n I can get u the 2." Fitz stated the two ounces would cost $1,250.

14. On March 25, 2022, CW-3 was searched by law enforcement and confirmed not to be in possession of controlled substances. CW-3 was subsequently provided a concealed

---

[2] CW-3 has been cooperating with law enforcement since approximately September 2021. During that time, law enforcement believes CW-3 has been truthful and reliable. CW-3 has provided information related to criminal activity which has been corroborated by law enforcement and other witnesses. CW-3 has convictions for the following offenses: Criminal Threatening [M] (NH RSA 631:4); Theft by Unauthorized Taking [M] (NH RSA 637:3); and Possession of Controlled Drug [M] (NH RSA 637:3).

audio/video recorder and followed by law enforcement to Fitz's residence – 389 Front Street, Manchester, New Hampshire. Upon arrival, Fitz was observed exiting the residence, entering CW-3's vehicle, and exchanging approximately 55 grams of a substance which field-tested positive for methamphetamine for $1,250. Based upon the recorded phone call and iMessages, I believe the methamphetamine was supplied by Pearson to Fitz and then sold to CW-3.

15. On March 30, 2022, law enforcement located the Target Vehicle at the Courtyard by Marriott hotel in Manchester, New Hampshire. At approximately 11:52 a.m., Pearson was observed exiting the hotel and entering the Target Vehicle. He departed from the hotel parking lot as the only occupant of the Target Vehicle.

16. The Target Vehicle was followed to the vicinity of 241 Pearl Street in Manchester where Pearson parked, exited the vehicle, and entered the residence. Pearson remained inside the residence for approximately forty minutes and then returned to the Target Vehicle. Pearson remained parked in the vicinity of the residence for approximately ten minutes. During that time, a vehicle arrived in close proximity, a female exited, entered the Target Vehicle for three minutes, exited, and then departed the area. The Target Vehicle then departed the area.

17. The Target Vehicle was followed to the vicinity of 26 Maurice Street in Manchester. An individual was observed exiting the residence, entering the Target Vehicle for approximately thirty minutes, exiting, and then re-entering 26 Maurice Street. The Target Vehicle then departed the area.

18. At approximately 1:51 p.m., the Target Vehicle arrived back at the Courtyard by Marriott hotel but Pearson remained in the Target Vehicle. At approximately 2:15 p.m., an unidentified male wearing a backpack approached the Target Vehicle. The male and Pearson appeared to exchange an unknown item which the male placed inside his backpack. Pearson then

exited the Target Vehicle and walked into the hotel with the unknown male. Based on my training and experience, I believe this meeting and the others described above likely involved the distribution of controlled substances by Pearson while utilizing the Target Vehicle.

### **INFORMATION REGARDING GPS TRACKERS**

19. Based upon my training, experience, and involvement in prior investigations, I know that individuals who distribute narcotics often use motor vehicles to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances use motor vehicles to transport controlled substances to various locations to meet with and distribute controlled substances to prospective purchasers. They also use motor vehicles to transport drug proceeds. Because individuals who are involved in the distribution of controlled substances are highly cognizant of the presence of law enforcement, and often engage in counter-surveillance maneuvers while traveling in a motor vehicle, it is frequently difficult for law enforcement to effectively conduct surveillance. The presence of a tracking device on a motor vehicle engaged in drug-related activity is beneficial because it allows law enforcement to track the movement of the vehicle effectively, while decreasing the chance of detection.

20. Accordingly, I believe the monitoring of a tracking device on the Target Vehicle for a forty-five (45) day period will lead to evidence, fruits, and instrumentalities of the aforementioned crime. In the event the Court grants this application, there will be periodic monitoring of the tracking devices during both daytime and nighttime hours. Because Pearson may sometimes park the Target Vehicle on private property, it may be necessary to enter onto private property and/or move the Target Vehicle in order to effect the repair, replacement, and removal of

the tracking device. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

## DELAYED NOTICE AND SEALING

21. I submit that there is reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result as defined in 18 U.S.C. § 2705, and that the facts of the case justify a period of delay of 90 days from the end of the 45-day tracking period. This warrant is being sought in connection with an ongoing long-term drug trafficking investigation, and I expect that the subjects of the investigation will not be arrested or otherwise learn of the covert investigation for a period of at least 90 days after the end of the tracking period. Premature notification of the execution of the warrant may cause adverse results, including endangering the safety of cooperating witnesses or law enforcement agents, flight of Pearson, Estes, or others from prosecution, and destruction of evidence.

22. For the same reasons stated in paragraph 21, I submit that there is cause to seal all documents related to this warrant for the same period.

## CONCLUSION

23. Based upon the facts set forth above, I respectfully request that the Court issue a warrant authorizing members of the FBI or their authorized representatives to install and monitor a tracking device on the Target Vehicle for 45 days from the date of installation. I further request authorization during the 45-day period to move the Target Vehicle to effect the repair, replacement, and removal of the tracking device, including when the tracking device is inside a private garage or other location not open to the public or visual surveillance, both within and outside the District of New Hampshire.

24. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the Court authorize installation and removal of the tracking device during both daytime and nighttime hours. Without authorization to install the tracking device during nighttime hours, investigators may be unable to surreptitiously install the device on the Target Vehicle.

25. I further request that the Court order that notice of execution of the warrant be delayed for 90 days from the end of the 45-day tracking period, that is, until August 24, 2022, and that all documents related to this warrant be ordered sealed until the same date.

/s/ Ryan S. Burke
Ryan S. Burke, Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. P. 41 and affirmed under oath the contents of this affidavit and application.

Date: **Apr 8, 2022**

Time: **1:33 PM, Apr 8, 2022**

Hon. Andrea K. Johnstone
United States Magistrate Judge